**Eileen CROWLEY, Plaintiff**

v.

**L.L. BEAN, INC., Defendant**

**No. CIV. 00–183–P–C.**

United States District Court,
D. Maine.

May 8, 2001.

Douglas A. Grauel, Rebecca S.K. Webber, Linnell, Choate & Webber, Auburn, ME, for Eileen Crowley, Plaintiff.

George S. Isaacson, Peter J. Brann, Brann & Isaacson, Lewiston, ME, for L.L. Bean, Defendant.

## AMENDED MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GENE CARTER, District Judge.

Plaintiff Eileen Crowley's two-count Amended Complaint alleges that Defendant L.L. Bean Inc. discriminated against her in violation of her rights under Title VII, 42 U.S.C. § 2000e–2 *et seq.* (Count I)

and the Maine Human Rights Act, 5 M.R.S.A § 4572 (Count II). *See* Amended Complaint (Docket No. 2). Specifically, Crowley asserts that L.L. Bean failed to take reasonable steps to eliminate or prevent the continuous sexual harassment she endured from a coworker. As a consequence of the alleged unlawful conduct, Crowley requests compensatory and punitive damages. L.L. Bean has filed a Motion for Summary Judgment. *See* Defendant L.L. Bean's Motion for Summary Judgment (Docket No. 33). For the reasons that follow, the Court will deny Defendant's Motion for Summary Judgment.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant .... By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party ....' " *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995) (citations omitted). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences. *See Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir.1997). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, "the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548); FED. R. CIV. P. 56(e). "This is especially true in respect to claims or issues on which the nonmovant bears the burden of proof." *International Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir.1996) (citations omitted).

## II. FACTS

In March 1996, Eileen Crowley started working at the L.L. Bean warehouse in Freeport, Maine, as a temporary, part-time employee. Plaintiff's Opposing Statement of Facts (Docket No. 38), Crowley Aff. ¶ 2. In July 1996, Crowley began training as a machine operator with Leo Davis, a trainer, on the second shift. Crowley Aff. ¶ 3. A man named Paul Juhl also worked on the second shift. Crowley Aff. ¶ 3. Sometime in September 1996, a general discussion in the break room concerning the subject of vision took place, and Juhl appeared to get angry at Crowley's response to a question he had posed to her during the discussion. Crowley Aff. ¶ 6. The veins in Juhl's neck were sticking out and he started shaking. Crowley Aff. ¶ 6.

On Sept. 25, 1996, Crowley's birthday, a group of employees and Crowley decided to go out after work for a drink. Crowley Aff. ¶ 7. As they were leaving the bar, a van pulled into the parking lot and out jumped Juhl, who was showered, shaved, and dressed in clean clothes. Crowley Aff. ¶ 7. He bowed down and ceremoniously handed Crowley a book wrapped in newspaper and a big bow. Crowley Aff. ¶ 7. In presenting the book to Crowley, he made an elaborate, swooping gesture with his

hand. Crowley Aff. ¶ 7. Crowley opened the book, which pertained to eye care, and thought that he was trying to make up for how he had behaved in the break room. Crowley Aff. ¶ 7. About a month later, L.L. Bean sponsored a "Team Day" at a local recreational facility. Crowley Aff. ¶ 8. At Team Day, Crowley got a cramp in her foot in the pool. Juhl grabbed her foot and started massaging it, refusing to let go of it. Crowley Aff. ¶ 8. Crowley had to forcibly pull her foot from him. Crowley Aff. ¶ 8; Plaintiff's Opposing Statement of Facts, Bickford Aff. ¶ 10. Also in October 1996, someone started to follow Crowley home from L.L. Bean after work; driving close behind her, shutting their car lights off, and repeatedly approaching the rear of her car. Crowley Aff. ¶ 10.

There was also a day in October 1996 when, because work was light, Crowley was allowed to leave early, before her shift was over. Crowley Aff. ¶ 11. Crowley quickly left the building, but suddenly felt somebody running after her. When Crowley turned around, she learned that it was Juhl. Crowley Aff. ¶ 11. Juhl wanted to show her something and he opened the door to his van, revealing a kayak. Crowley Aff. ¶ 11. Then he pulled out an oar with a big red ribbon wrapped around it and gave it to her, explaining that she would not need to be alone "on the lake" again.[1] Crowley Aff. ¶ 11. Crowley took the oar and left. Crowley Aff. ¶ 11.

In December 1996, Juhl began a pattern of giving Crowley hand-carved wooden coins with various sayings written on them. Crowley Aff. ¶ 13. He continued giving her coins for several months. Crowley Aff. ¶ 13. If she refused to take them from him, he would throw them hard at her. Crowley Aff. ¶ 13. Also in December, Juhl would show up regularly to help her, even though he was scheduled to work in a different building. Crowley Aff. ¶ 14. At the time, Crowley was in charge of the "ready area" at one of L.L. Bean's warehouse facilities—Building B, Casco Receiving Center ("CRC"). Crowley Aff. ¶ 14. Crowley went to Keith Menard and told him about Juhl giving her coins and showing up in her work area when he didn't need to be there. Crowley Aff. ¶ 15. Later in December, Crowley went to a Christmas party at Juhl's house with some of her L.L. Bean co-workers. Crowley Aff. ¶ 16. Juhl watched Crowley throughout the party. Crowley Aff. ¶ 16. Juhl followed her and showed her a map on the wall, pointing out where Crowley's house was located. Crowley Aff. ¶ 16. Crowley left the party.[2] Crowley Aff. ¶ 16.

In January 1997, Crowley began work on the third shift. Crowley Aff. ¶ 18. At this time, Juhl also worked on the third shift. Crowley Aff. ¶ 18. He continued to appear in her building, even when he wasn't scheduled to be there and to hang around Crowley's work area. Crowley Aff. ¶ 18. About two weeks after Crowley started working on third shift, she told John Andretta—Crowley's team leader at the Order Fulfillment Center ("OFC")— about the problems she was and had been having with Juhl. Plaintiff's Opposing

---

1. Crowley was intimidated by Juhl's conduct because the weekend before she had been out on the lake in front of her house and could not get back to shore because she lost a boat oar. Crowley Aff. ¶ 11. Juhl's statement led Crowley to believe that he had been watching her that previous weekend. Crowley Aff. ¶ 11.

2. Crowley left Juhl's house without the crock pot she had bought for the party. Juhl later wanted Crowley to come to his house to pick up her crock pot; but she refused, insisting that he bring it to work with him. Crowley Aff. ¶ 17.

Statement of Facts, Andretta Aff. ¶ 7 [3]; Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. A L.L. Bean Depo. I at 73–74. She also told Steve McCourt—her team leader at the CRC—about numerous incidents that occurred either during work or on L.L. Bean property. Plaintiff's Opposing Statement of Facts, McCourt Aff. ¶¶ 5, 7–10. McCourt told supervisor Tim Marong. McCourt Aff. ¶¶ 7–10. That same month, Juhl entered Crowley's car at work without permission, and demanded a ride from her to another building. Crowley Aff. ¶ 19. Juhl also gave Crowley a pair of Bean boots and appeared to get angry when she refused them.[4] Crowley later found the boots on her car in the L.L. Bean parking lot. Crowley Aff. ¶ 20.[5]

3. L.L. Bean objects to Crowley's reliance on the affidavits of current and former L.L. Bean employees, arguing that Crowley's communications with them violated Maine Bar Rule 3.6(f). Defendant L.L. Bean's Reply Statement of Facts (Docket No. 46) at 2. Defendant specifically objects to the use of the affidavits of John Andretta, Tammy Bickford, James M. Campbell, Michael T. Crossman, Kenneth R. Libby, Steve McCourt, Keith Menard, Bennett Schlaack, and George F. Weekes. Id. Plaintiff strenuously disputes that she violated the Maine Bar Rules.

The United States District Court for the District of Maine has adopted the Code of Professional Responsibility of the Maine Supreme Judicial Court. See LOCAL RULE 83.3(d). Maine Bar Rule 3.6(f) prohibits communications between an attorney and an adverse party that is represented by counsel. Two of the affidavits at issue were given by individuals who were no longer employed by L.L. Bean at the time of their interview. See Affidavits of John Andretta and Keith Menard. There is certainly no violation of the rule with respect to Crowley securing the statement of those former L.L. Bean employees. With respect to those individuals who were employed by L.L. Bean when they gave their statements, the Court notes that the Professional Ethics Commission of the Maine Board of Overseers of the Bar has opined on this question in a closely related context—a municipal corporation. In this opinion, the Commission concluded that the rule reaches only those employees who "have responsibility for making decisions on the litigation and matters directly related to it," and employees "who have the responsibility of communicating municipal policy and decisions to its attorney, receiving the attorney's advice in the first instance, and directing the work of the municipality's staff in preparing for litigation." Maine Manual on Professional Responsibility (2000), Opinion 94. Explaining further that "unless they are in the category of officials who will be deemed to represent the municipality or unless they are separately represented by counsel in the matter," there is no reason to inhibit counsel from investigating the facts and preparing for trial. Id. The Court finds that the issue regarding the scope of representation applicable to municipal corporations applicable to private corporations such as L.L. Bean. The employees who gave sworn statements are witnesses to the events in this case. Such employees are subject to being interviewed unless Defendant shows that they are within the scope of representation contemplated by Maine Bar Rule 3.6(f). Defendants have not made such a showing. The Court, therefore, denies Defendant's request to exclude those affidavits.

4. Crowley became aware of Juhl's violent temper over time through the reputation he had gained as well as through personal observation. Crowley Aff. ¶ 72; Andretta Aff. ¶ 9. According to Bennett Schlaack, third shift employees were aware of Juhl's violent temper, and had observed him throw tantrums and punch or kick boxes and equipment in a rage. Plaintiff's Opposing Statement of Facts, Schlaack Aff. ¶¶ 10–11. Alan Coffin witnessed one of Juhl's "tantrums" at work when some cases fell off a piece of equipment that he had been operating. Plaintiff's Opposing Statement of Facts. Coffin Aff. ¶ 18. Juhl began to scream, kick, and punch the cases, and it took him a long time to calm down. Coffin Aff. ¶ 18. Other employees had told supervisory employees, such as Leo Davis, that they were scared of Juhl. Davis' Depo. at 94. Juhl's violent outbursts made his pursuit of Crowley particularly intimidating, especially on third shift when few people were at work and much of each building was dark. Crowley Aff. ¶ 18.

5. Crowley did not give them back this time because she did not want to keep on having this interaction with him. Crowley Aff. ¶ 20.

Sometime in January 1997, Juhl waited for Crowley outside the women's bathroom at work near the ready area at a time when he was not even scheduled to be in that building. Crowley Aff. ¶ 23. Crowley reported this incident to Andretta. Crowley Aff. ¶ 23. Crowley also told Andretta that she was afraid and that Juhl was always trying to be near her. Crowley Aff. ¶ 21. Co-workers had started to refer to Juhl as "Eileen's little stalker." Crowley Aff. ¶ 21. Around this time, Juhl began to frequently park his van next to Crowley's car in the L.L. Bean parking lot. Crowley Aff. ¶ 22. If Crowley would move her car at break time, she would find later that he had also moved his car to be again parked next to hers again. Crowley Aff. ¶ 22. She reported this to Dave Baker, a supervisor, and Andretta. Crowley Aff. ¶ 22. Also in January, Juhl returned Crowley's crockpot by putting it in her car in the L.L. Bean parking lot without her permission. Crowley Aff. ¶ 25. Around this same time, an incident occurred in which Steve Chamberlain, the stock control clerk, radioed Crowley that she needed to go to the other building to work and that Juhl would give her a ride to the building. Crowley Aff. ¶ 26. Crowley refused and, after Crowley explained the situation to Chamberlain, he did not require Crowley to go to the other building with Juhl. Crowley Aff. ¶ 27.

In February 1997, Crowley again discussed her worries and concerns about Juhl stalking her with Andretta. Crowley Aff. ¶¶ 29–30. Other employees noticed that Juhl seemed to always be where Crowley was, for example, rushing to sit beside her at meetings and breaks, and going out of his way to be near her. Bick-

ford Aff. ¶¶ 14–15; Campbell Aff. ¶¶ 5–7. Juhl would also often work in Crowley's aisle, sometimes blocking her movement. Bickford Aff. ¶ 16. Crowley also spoke to team leader McCourt in January or February of 1997 about problems with Juhl, including, among other incidents, the boat oar, the parking his car next to hers, his following her around at work, and his acts of blocking aisles. McCourt Aff. ¶¶ 7–9. McCourt agreed to keep an eye on Juhl and told Crowley to contact him immediately if she had any further trouble with Juhl. McCourt Aff. ¶ 10. Crowley also notified both of her team leaders that she was scared of Juhl. Crowley Aff. ¶ 30; McCourt Aff. ¶ 9. McCourt went to supervisor Tim Marong in January or February of 1997 and told him what Crowley had reported. McCourt Aff. ¶¶ 7–10.

On February 16, 1997, Juhl entered Crowley's house uninvited and unannounced. Crowley Aff. ¶ 35. He started taking off his boots, even though Crowley told him not to. Crowley Aff. ¶ 35. Juhl kept trying to get Crowley to touch his sweater, gesturing to the sweater's V-neck.[6] Crowley Aff. ¶ 35. Then he tried to grab her hand. Crowley Aff. ¶ 35. Crowley started to go into the kitchen to get away from his reaching for her hand; he grabbed her wrist, and released it only when she pulled it back. After a verbal exchange, Crowley understood that Juhl had recently been outside her house watching her. Crowley Aff. ¶¶ 35–37. Finally, Crowley was able to persuade Juhl to leave. Crowley Aff. ¶¶ 38–39. After Crowley got him out the door, she shut and locked the door, then ran around the house to make sure that everything was locked.[7] Crowley Aff. ¶ 41. A half an

---

6. Juhl was wearing military fatigue pants with a sweater like the army sweaters with patches on the elbows. Crowley Aff. ¶ 35.

7. Crowley did not go to the police at that time because she thought she might hurt Juhl's chances of getting hired as a regular, part-time employee if she did, and she was afraid

hour later, Crowley saw someone whom she thought was a woman, cross-country skiing in her front yard. Crowley Aff. ¶ 44–46. At the time, Crowley was on the phone with Tammy Bickford, another L.L. Bean employee. Crowley Aff. ¶ 46. Suddenly Crowley saw Juhl, in a new outfit, standing outside her kitchen window just staring, his face pressed against the window. Crowley Aff. ¶ 46. Juhl departed, but he left his ski poles by her door. Crowley Aff. ¶ 47.

Later that night, Crowley brought Juhl's ski poles to work and gave them to team leader Andretta. Crowley Aff. ¶ 48. She told him that Juhl had come to her home three days in a row and that she had brought the ski poles in so that Juhl would have no excuse to go back to her home.[8] Crowley Aff. ¶ 48. Andretta went to Juhl and told him that Crowley did not want him pursuing her.[9] Andretta Aff. ¶ 23. Crowley also told McCourt and Marong about Juhl's invasion of her home and cross-country skiing in her front yard. McCourt Aff. ¶ 16; Crowley Aff. ¶ 50. Andretta spoke to McCourt and Marong about Juhl invading Crowley's home.[10] Andretta Aff. ¶ 25. On February 17,

McCourt scheduled an appointment for Crowley to meet with Pat Bressette–Long of the Human Resources Department ("HR"). McCourt Aff. ¶ 16; Crowley Aff. ¶ 50. McCourt also spoke to supervisor Marong about the Crowley/Juhl issue. McCourt Aff. ¶¶ 16, 28–29.

On February 17, Crowley spoke to Bressette–Long about Juhl. Crowley Aff. ¶ 51. Crowley understood that Bressette–Long wanted her to follow the chain of command and tell the people who needed to know if Juhl continued to harass her. Crowley Aff. ¶¶ 51, 54. During her discussion with Bressette–Long, Crowley reported all of the incidents with Juhl, including his uninvited intrusion into her house, his observing her from outside her home, his following her home from work, the gift incidents, the act of grabbing her foot in the pool, his behavior at the Christmas party, other people's remarks on his behavior toward her, and his frequent appearance near her at work.[11] Crowley Aff. ¶ 52. Bressette–Long gave Crowley the L.L. Bean security phone number and her phone number. Crowley Aff. ¶ 53.

In March 1997, Marong discussed the home invasion with Crowley. Defendant

that he would blame her and then retaliate against her. Crowley Aff. ¶ 44. Also, Leo Davis had told Crowley and others several times that they had to make sure they had a very clean record if they wanted to get hired. Crowley Aff. ¶ 45; Plaintiff's Opposing Statement of Facts, Menard Aff. ¶ 6.

8. Crowley also told Andretta that she was concerned about bringing management's attention to the issue because the hiring process for temporary, part-time positions to regular, part-time positions was to take place within a week. She told him she was concerned that if she filed a complaint against Juhl and he did not get hired, he would retaliate against her, or she would be considered a trouble-maker and would not be hired. Crowley Aff. ¶ 49. Andretta told Crowley he understood, saying "[W]e'll try to get around it." Crowley Aff. ¶ 49; Andretta Aff. ¶¶ 19–21.

9. Sometime in February 1997, Andretta himself witnessed Juhl waiting for Crowley outside of the women's bathroom. Andretta Aff. ¶ 11. This was the second bathroom incident. Crowley Aff. ¶ 31. Andretta told Crowley that he had witnessed Juhl waiting outside the lady's room while she was inside. Andretta Aff. ¶ 11; Crowley Aff. ¶ 31.

10. There is a factual dispute as to whether all of these conversations occurred on or after February 17.

11. Bressette–Long claims she did not hear of the home invasion until March 17. Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. H Bressette–Long Aff. ¶ 9.

L.L. Bean's Statement of Undisputed Material Facts, Ex. F Marong Aff. ¶ 6. Marong encouraged Crowley to call the police or L.L. Bean security if there were any further out-of-work incidents that made her uncomfortable. Marong Aff. ¶ 6. Marong also told Crowley to call Bressette-Long if she had any more problems with Juhl. Marong Aff. ¶ 6. Marong told Crowley that L.L. Bean would schedule her and Juhl in different buildings to keep them apart.[12] Marong Aff. ¶ 9. Supervisor Marong instructed team leaders McCourt and Andretta to keep Crowley and Juhl in separate buildings. McCourt Aff. ¶ 18; Crowley Aff. ¶ 32.

On March 10, 1997, L.L. Bean conducted hiring for regular, part-time employees. Juhl was hired. Crowley was not one of the people hired for regular, part-time work. Crowley Aff. ¶ 55. On March 17, 1997, Marong called Bressette-Long and told her about the home invasion. Bressette-Long Depo. at 21–22, 132–33. L.L. Bean performed a criminal background check on Juhl that revealed that Juhl had not been convicted of a crime. Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. G Bressette-Long Depo. at 22. On March 24, Crowley was hired as regular, part-time employee. Crowley Aff. ¶ 56. Crowley was told that her hire would be retroactive to March 10, 1997. Crowley Aff. ¶ 56.

L.L. Bean has two distribution/warehouse facilities in Freeport—OFC and CRC. L.L. Bean Depo. I at 220, 223. Two teams rotate on a daily basis, between the two distribution facilities. L.L. Bean Depo. I at 220, 223. It is common practice at L.L. Bean to ask employees working in one warehouse building to volunteer to work in another building when the work-load is heavier there. Marong Aff. ¶ 6; L.L. Bean Depo. I at 220, 223. Hence, although Crowley and Juhl were put on separate shifts in March 1997, this action did not keep Juhl away from Crowley. Andretta Aff. ¶¶ 27–28; McCourt Aff. ¶¶ 19–20. During the time that Juhl and Crowley were supposed to be separated, Juhl was allowed to volunteer to work in her building. Andretta Aff. ¶ 30–35; McCourt Aff. ¶¶ 19–20. While in that building, Juhl would get near to Crowley at department meetings, go out of his way to sit next to her, and shadow her while she was working by going up on his machine when she went up and going down when she went down. Crowley Aff. ¶ 58. Throughout March, Crowley had a number of meetings with Bressette-Long to keep her informed about Juhl's activities. Crowley Aff. ¶ 57.

In April 1997, Andretta left his team leader position and was replaced by team leader Dave Baker. Crowley Aff. ¶ 61. When the change took place, Tammy Bickford went to the new team leader, Baker, and told him that Juhl was stalking Crowley. Bickford Aff. ¶¶ 33–34. Around the same time, Leo Davis was appointed to a newly created position—performance team leader. Crowley Aff. ¶ 61. Crowley reported to Baker and Bressette-Long that Juhl was interfering with her work by blocking her in aisles with his machine. Crowley Aff. ¶ 62. For example, Crowley reported that one day while she was working up high in an area that was not well lit, she noticed a shadow go across the lighted end of the aisle, looked up, and saw Juhl standing in the end of the aisle, dancing like "John Travolta in that movie Night Fever." Crowley Aff. ¶ 63. Crowley met with Bressette-Long a number of times in

---

**12.** There is a factual dispute as to whether Marong also told Crowley that there may be occasions when Crowley and Juhl would need to work in the same building. Marong Aff. ¶ 9; Plaintiff's Opposing Statement of Facts ¶ 21.

April and May, and specifically told her about this incident. Crowley Aff. ¶¶ 64–65.

In May 1997, Crowley talked to Bressette–Long and Dave Simmons about problems with Juhl. Crowley Aff. ¶ 66. Bressette–Long investigated Crowley's complaints. Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. H Bressette–Long Aff. ¶ 10. As part of the investigation, Bressette–Long interviewed Juhl and team leader Andretta. Bressette–Long Aff. ¶ 10. After talking to Andretta, Bressette–Long understood that the team leaders were attempting to keep Crowley and Juhl separate at work by scheduling them in different buildings or on different shifts and teams. Bressette–Long Aff. ¶ 10.[13] Bressette–Long, advised Tim Parker, the director of security, of Crowley's concerns and Juhl's conduct. Parker asked security employee Mike Coughlin to investigate. Bressette–Long Depo. at 38, 127, 129, 131. As a result of Crowley's complaints and the investigation, Bressette–Long and the new third shift supervisor, Dave Simmons, met with Juhl on May 12, 1997, and delivered a verbal warning to avoid contact with Crowley in the workplace. Bressette–Long Aff. ¶ 11. Bressette–Long explained that Crowley was uncomfortable with Juhl's behavior, instructed him to stay away from Crowley in the workplace, and told him that any failure on his part to try to avoid contact with Crowley would result in more severe disciplinary action by L.L. Bean.

Bressette–Long Depo. at 59–60, 83–84; Bressette–Long Aff. ¶ 11.

Shortly after being given the warning, there was a request for volunteers to go to work in another building, and Juhl was allowed to volunteer. L.L. Bean Depo. I at 220, 223. Immediately upon arrival, Juhl would look for Crowley and position himself near her, even if he was not supposed to be in her area. Crowley Aff. ¶ 68. Juhl followed her in this manner throughout May and June 1997. Crowley Aff. ¶ 68. In June and July 1997, Juhl would go into an aisle next to Crowley's and he would go up and down on a transtacker at the same time she went up or down so that he could see her across the shelving. Crowley Aff. ¶ 69. In late June or early July, Crowley was admitted to the hospital for stress-related dehydration. Crowley Aff. ¶ 70.

In July 1997, Crowley was moved from the third shift to the first shift, and Juhl remained on the third shift. Crowley Aff. ¶ 73. At the end of his shift, Juhl would wait at the time clock in an apparent attempt to see Crowley. Crowley Aff. ¶ 73. Crowley tried to use different time clocks to avoid him. Crowley Aff. ¶ 73. On September 2, Crowley was moved from first to second shift. Crowley Aff. ¶ 74. Upon Crowley's change of shift, Juhl, instead of remaining after his shift, started coming in early and appeared in her building during Crowley's shift. Crowley Aff. ¶ 74. Juhl would seek Crowley out and make contact with her or position himself near her.

---

**13.** Crowley has moved to strike portions of Bressette–Long and Tim Marong's affidavits. *See* Motion to Strike Portions of Defendant's Affidavits (Docket No. 43). Crowley argues that two statements in Bressette–Long's affidavit were made without her personal knowledge. For purposes of this motion, the Court will deny Plaintiff's motion with respect to the testimony of Bressette–Long because the statements were based on Bressette–Long's understanding of the facts and are proffered for the purpose of assessing the adequacy of her action. The Court will also deny Plaintiff's request to strike portions of Marong's affidavit. Plaintiff does not request that any particular portion of Marong's affidavit be striken and there do not appear to be any statements in Marong's affidavit made upon information and belief.

Crowley Aff. ¶ 74. Crowley reported his behavior to various supervisors, including Dave Baker, Pete Farley, Steve Gowen, Leo Davis and Keith Menard, the team leader on the second shift. Crowley Aff. ¶ 74; Plaintiff's Opposing Statement of Facts, Menard Aff. ¶¶ 7–9. Also in the fall of 1997, another employee, Jimmy Campbell, went to a supervisor, Gowen, and reported the manner in which Juhl was always following Crowley around and was going out of his way to be near her. Plaintiff's Opposing Statement of Facts, Campbell Aff. ¶¶ 11–13. Campbell also reported to Gowen that Crowley was worried about Juhl's behavior. Campbell Aff. ¶¶ 11–13.

From October 1997 through December 1997, Juhl continued to overlap his shift with Crowley's. Crowley Aff. ¶ 75. When Juhl appeared, just as he did the other times, he tried to be physically near her, sometimes blocked her, watched her and stared at her, and would stand at the end of the aisle in which Crowley was working. Crowley Aff. ¶ 75. Juhl's conduct toward Crowley continued throughout the winter of 1997 and spring of 1998. Weekes Aff. ¶¶ 6–8. On January 1, 1998, Crowley began to work on the first shift. Crowley Aff. ¶ 79. Juhl continued to volunteer to work in the same building as Crowley, and L.L. Bean allowed him to do so. Crowley Aff. ¶ 79. Crowley frequently encountered Juhl when they were working in the same building. Crowley Aff. ¶ 79.

In late January 1998, Crowley, while working on the first shift and about to return to the third shift, spoke with the first shift supervisor of replenishment, Bob Anderson, about Juhl. Anderson Depo. at 21–23. Crowley told Anderson that she could not work in the same area as Juhl. Anderson Depo. at 21–23. Anderson com-municated Crowley's request to Dave Simmons, the third shift supervisor. Anderson Depo. at 23, 25, 27–28. Simmons responded that everyone should make "darn sure" that Juhl and Crowley are kept separate. Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. U.

In early February 1998, following the death of a friend of Crowley's from cancer, Juhl gave Crowley a book on cancer prevention.[14] Crowley Aff. ¶ 82. When Juhl gave Crowley the book, he pushed the book on her and tried to grab her hand while giving her the book, holding onto the book so that their hands would touch. Crowley Aff. ¶ 83. On February 17, 1998, Crowley was put back on the third shift—the same shift Juhl worked. Crowley Aff. ¶ 84. Although employees from the third shift had two teams of workers who were initially assigned to work in different buildings, the third shift workers often ended up in the same building. Plaintiff's Opposing Statement of Facts, Bickford Depo. at 91.

Juhl continued to block Crowley in the aisles where she was working, park his machine at the end of her aisle, and work near her instead of where he was assigned. Crowley Aff. ¶ 85. This behavior occurred from February through April 1998. Crowley Aff. ¶ 85. Juhl also continued to shadow Crowley with his machinery, going up in an adjoining aisle when she went up and going down when she went down. Crowley Aff. ¶ 86. Depending on how dense the shelves were, Crowley might suddenly find herself looking across a shelf directly at Juhl, who would be staring at her. Crowley Aff. ¶ 86. Other times, he would put himself in the position exactly where she

---

14. He gave this book to Crowley right after her friend's death, and Crowley believes that the only way he could have known about the death is by following and watching her. Crowley Aff. ¶ 82.

needed to work, forcing her to ask him to move. Crowley Aff. ¶ 86.

On March 30, 1998, first and third shifts were consolidated into first shift, with two teams alternating between L.L. Bean's two distribution centers. Crowley Aff. ¶ 87. L.L. Bean scheduled both Crowley and Juhl on first shift. Crowley Aff. ¶ 87. On March 30, Juhl went to the wrong building to work—where Crowley, not he, was scheduled to work. Campbell Aff. ¶ 16. On March 31, Juhl again went to the wrong building—again where Crowley, not he, was scheduled to work. Crowley Aff. ¶ 89. On April 1, 1998, Juhl arrived at Crowley's building for the third day in a row. Crowley Aff. ¶ 90. Immediately after seeing Juhl, Crowley went to Baker, stating that she believed that she and Juhl were supposed to be in separate buildings. Crowley Aff. ¶ 91. Shortly thereafter, Crowley heard Juhl being paged to go to the office and learned that he had been made to leave the building. Crowley Aff. ¶ 91. Not long after this incident, sometime in April 1998, Juhl got in front of Crowley with a machine he was operating, and she asked him to move. Crowley Aff. ¶¶ 94–95. Juhl turned, stared, and said that her request would "cost [her]." She reported the incident to Coffin, who told Crowley that he had reported the incident to Bob Anderson. Crowley Aff. ¶¶ 94–95. On April 27, Juhl was put on the second shift, and he resumed his early arrival to overlap with Crowley's shift. Crowley Aff. ¶ 96. When Juhl appeared, just as he did the other times that he had shown up in Crowley's building, he tried to be physically near her, watched her and stared at her, and stood at the end of her aisle. Crowley Aff. ¶ 96.

On June 23, immediately after Juhl was allowed to volunteer for Crowley's shift, Juhl again tracked her down. Crowley Aff. ¶ 100. At one point during the shift, Juhl parked his machine at the end of the aisle where Crowley was working, blocked her path, and refused to move when she asked him to.[15] Crowley Aff. ¶ 100. Juhl was stocking cases and was in the lower end aisles. Crowley was assigned to work in the upper aisles. Crowley Aff. ¶ 101. As she was working, Crowley became aware that Juhl had moved his cases and his work to the end of her aisle. Crowley Aff. ¶ 101. She returned to stock control and was asked if she could work in the back-to-stock aisle, which was far away from where Juhl was working. Crowley Aff. ¶ 101. Shortly after starting work in the back-to-stock aisle, Crowley noticed that Juhl was again cutting stock nearby, where she believed he should not have been. Crowley Aff. ¶ 101. As she got closer, she saw that he was simply staring up at her as she was up in the air, and she told him to move so that she could get her machine past. Crowley Aff. ¶ 101; Schlaack Aff. ¶ 21. Juhl only looked up and smiled. Crowley Aff. ¶ 101; Plaintiff's Opposing Statement of Facts, Schlaack Aff. ¶ 21. Then Crowley saw Davis, performance team leader, come into the area, motion to Juhl, and talk with him. Crowley Aff. ¶ 102. She looked down at Davis and he looked at her, and she then realized that Davis was not going to take any further action to stop Juhl from staring at her. Crowley Aff. ¶ 102. Crowley told Juhl again that she needed to get by, and he started laughing. Crowley Aff. ¶ 103. When Crowley asked Juhl to move, he

15. On June 23, while Dave Paquette and Jimmy Campbell were working together, Campbell saw Juhl tearing out of an aisle on his machine, going so fast that he banged his machine into a safety rail. Plaintiff's Opposing Statement of Facts, Campbell Aff. ¶ 20. Paquette and Campbell went to see where Juhl was in such a hurry to go, and Campbell saw that it was the aisle where Crowley was working. Campbell Aff. ¶ 20.

moved his machine just far enough out of the aisle to allow her to move her machine. Crowley Aff. ¶ 103; Schlaack Aff. ¶ 21.

Crowley dropped her work off and began to cry. Crowley Aff. ¶ 104. It was at that point that she realized L.L. Bean was not going to take any action to keep Juhl away from her. Crowley Aff. ¶ 104. Crowley went back to where Juhl was working and told him that when he saw her in an aisle, he needed to stay away from her and to go work in another aisle. Crowley Aff. ¶ 104. Juhl got down from his machine and got on his hands and knees, saying "I will obey your paranoid delusions." Crowley Aff. ¶ 104. Then he started bowing on the ground, making motions with his hand and, finally, placed himself in a prayer position at her feet. Crowley Aff. ¶ 104. Immediately after this incident, Crowley left work.[16] Crowley Aff. ¶ 105.

The next day, Anderson asked Davis to investigate what had happened. Plaintiff's Opposing Statement of Facts, Anderson Depo. at 41–42, 50. Crowley told Davis that this was an ongoing thing and that he should look at all the documentation that Bressette–Long had compiled. Crowley Aff. ¶ 106. The same day, Peter Farley and Steve Gowen told Crowley that they were assigning her to the dock.[17] Campbell Aff. ¶¶ 22, 107. In June of 1998, Ken Libby went to Anderson and told him that if L.L. Bean did not do something about the situation between Juhl and Crowley, they would be reading about her in the headlines. Anderson Depo. at 46; Plaintiff's Opposing Statement of Facts, Libby Aff. ¶ 21. Juhl's conduct on June 23, 1998, was found to be in violation of L.L. Bean's policy 3.1, "Standards of Behavior," and he was given a written warning on June 30, 1998. Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. J, Written Warning to Juhl; L.L. Bean Depo. I at 192; Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. B, L.L. Bean Depo. II at 66–68; Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. I, Batchelder Depo. at 25–27. The written warning, issued by L.L. Bean supervisor Becky Batchelder, stated, in part, that Juhl had created a "hostile environment" and had "engaged in threatening and intimidating behavior." Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. J; Batchelder Depo. at 68. The written warning also stated:

> The team leaders will attempt to schedule you and Eileen in separate facilities, and you must abide by the schedule and avoid contact. If, however, business needs dictate that we schedule you in the same facility, you will avoid contact with Eileen, including remaining as far from her as possible. If, after investigation of an observed or reported incident of contact, we feel that you could have avoided the incident, we will enact further disciplinary action up to and including termination.

Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. J; Batchelder Depo. at 68.

---

16. L.L. Bean had previously authorized Crowley to leave work early that day. Crowley Aff. ¶ 105.

17. During the time Crowley was assigned to the dock, Juhl drove his machine past the dock on at least one occasion. Crowley Aff. ¶ 110. On June 27, 1998, Juhl came out to the dock where Crowley was working to pick up stock. Crowley Aff. ¶ 110. He drove his order picker operator machine out to the dock to pick up cases of merchandise, even though the forklifts would routinely pick up the cases. Crowley Aff. ¶ 110. Crowley reported this conduct to dock coordinator Gowen. Crowley Aff. ¶ 110. Gowen noticed and reported the incident to management and HR. Plaintiff's Opposing Statement of Facts, L.L. Bean Depo. III at 219–220 and Ex. 67.

On July 3, Crowley contacted the Freeport Police Department to file a complaint against Juhl for harassment. Crowley Aff. ¶ 113. On July 6, Crowley went to the Lewiston District Court, and obtained a Temporary Protection Order against Juhl. Defendant L.L. Bean's Statement of Undisputed Material Facts Ex. W; Crowley Aff. ¶ 114. On July 7, Crowley went to work at the OFC. Crowley Aff. ¶ 115. As she was entering the building, she saw Juhl entering the building in front of her and walking into the break room. Crowley Aff. ¶ 115; Plaintiff's Opposing Statement of Facts, Crossman Aff. ¶¶ 30–32. Crowley immediately went to work. Crowley Aff. ¶ 115; Crossman Aff. ¶¶ 30–32. Juhl was permitted to remain in the building. Crowley Aff. ¶ 116; Crossman Aff. ¶ 34; Plaintiff's Opposing Statement of Facts, Davis Depo. at 40–41. When Crowley heard that Juhl was allowed to stay in the building, she decided that she needed to go to the Freeport Police to give them the Temporary Protection Order to serve on Juhl. Crowley Aff. ¶ 117. Juhl was served with a Temporary Protection Order by a Freeport Police officer at L.L. Bean. Crowley Aff. ¶ 120; Batchelder Depo. at 27, 29. Upon being served the order, Juhl was suspended from L.L. Bean with pay. Davis Depo. at 41; Batchelder Depo. at 27. On July 17, the Lewiston District Court held a hearing and granted Crowley's request for a Protective Order against Juhl. Defendant L.L. Bean's Statement of Undisputed Material Facts Ex. X; Crowley Aff. ¶ 126. L.L. Bean terminated Juhl's employment effective June 24, 1998. L.L. Bean Depo. I at 195; Batchelder Depo. at 72.

In September 1998, Crowley filed a complaint with HR, alleging that Davis and Farley had not protected her from harassment by Juhl. Crowley Aff. ¶ 133. After hearing the results of L.L. Bean's investigation into Davis's conduct, Crowley believed that L.L. Bean would not protect her from harassment. Crowley Aff. ¶ 135. On December 18, Crowley signed a charge of discrimination complaint, which was received by the Maine Human Rights Commission ("MHRC") on December 21, 1998. Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. Y; Crowley Aff. ¶ 137.

## III. DISCUSSION

Among other things, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). This includes unwelcome, sex-based conduct that alters a term or condition of employment—also referred to as a hostile work environment sexual harassment. Similarly, the Maine Human Rights Act forbids hostile work environment sexual harassment. *See* 5 M.R.S.A. § 4572. Both statutes set forth a limitation period in which claims must be filed in order to be actionable. As a preliminary matter, the Court will consider whether the claims in this Amended Complaint were filed within the respective statute of limitations. The Court will then consider whether Crowley has satisfied the elements of her prima facie case. Finally, the Court addresses Crowley's punitive damages claim.

### A. Time Limit Provisions of Title VII

Defendant claims that only incidents of alleged sexual harassment occurring after April 15, 1998, are actionable under Title VII (Count I) and that only incidents occurring after June 21, 1998, are actionable under the MHRA (Count II). Plaintiff disagrees with Defendant's premise that some of the acts of harassment alleged are

not actionable under either statute of limitations, and argues that the evidence in the record establishes that a continuing violation such that all of the sexual harassment perpetrated by Juhl is actionable. In the alternative, Plaintiff insists that even if the record does not support a continuing violation, the acts of sexual harassment that are time barred are nonetheless admissible as evidence of the discriminatory environment. In addition, Plaintiff challenges the date calculated by Defendant for timely claims under Title VII, asserting that even if no continuing violation is found, the actionable Title VII sexual harassment in this case should be those acts that occurred after February 1998.[18]

Since the calculation of the statutes of limitation is relevant either to determine whether Plaintiff has established an anchor claim for purposes of a continuing violation or, in the absence of a continuing violation, to determine what acts of discrimination may be compensable in this case, the Court will first address the applicable statutes of limitation. Maine law provides that an "action shall be commenced not more than 2 years after the act of unlawful discrimination." *See* 5 M.R.S.A. § 4613(2)(C). Plaintiff filed her Complaint with this Court on June 22, 2000. Therefore, in the absence of a continuing violation, Plaintiff must establish that an act of discrimination occurred on or after June 22, 1998, in order to recover under the MHRA.

The parties do not agree on the date by which to calculate the statute of limitation under Title VII in this case. In order to bring a Title VII lawsuit in federal court, a plaintiff must first timely file a charge of discrimination with either the Equal Employment Opportunity Commission ("EEOC") or the relevant state or local agency that oversees the processing of such charges. *See* 42 U.S.C. § 2000e–5(e)(1). A Title VII lawsuit may assert only those allegations of discrimination or unlawful employment practices that occur within a statutorily specified period of time prior to the filing of a charge of discrimination. When a plaintiff files a charge of discrimination with the EEOC, that statute of limitations is one hundred eighty days. *See id.* However, when a claimant "has instituted proceedings with a State or local agency with the authority to grant or seek relief" from the charge of discrimination, the statute of limitations is extended to three hundred days. *Id.*

"In order to give States and localities an opportunity to combat discrimination free from premature federal intervention, the Act provides that no charge may be filed with the EEOC until 60 days have elapsed from the initial filing of the charge with an authorized state or local agency, unless the agency's proceedings 'have been earlier terminated.'" *EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 110–11, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988)(quoting 42 U.S.C.2000e–5(c)). Title VII also authorizes the EEOC to enter into work sharing agreements with state agencies.

18. In applying the MHRA prohibition on sexual harassment, the Law Court has consistently looked to federal law for guidance where "federal courts [are] interpreting ... federal statutory equivalents" to the MHRA. *Maine Human Rights Commission v. Local 1361,* 383 A.2d 369, 375 (Me.1978). *See also Nadeau v. Rainbow Rugs, Inc.,* 675 A.2d 973, 976 (Me.1996); *Maine Human Rights Commission v. Maine Dept. of Defense and Veterans' Services,* 627 A.2d 1005, 1007 (Me.1993); *Bowen v. Dept. of Human Services,* 606 A.2d 1051, 1053 (Me.1992); *Plourde v. Scott Paper Co.,* 552 A.2d 1257, 1262 (Me.1989); *Percy v. Allen,* 449 A.2d 337, 342 (Me.1982). The Court will thus analyze the Crowley's MHRA claims under the analogous federal standard.

*See* 42 U.S.C. § 2000e–8(b). *See also* 29 C.F.R. § 1601.13(a)(3)(iii); 29 C.F.R. § 1601.13(b)(1). In *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96, the Supreme Court has held that a state agency "terminates" its proceedings within the meaning of 42 U.S.C. § 2000e–5(c) if it has waived the sixty-day deferral of filing period in a work sharing agreement with the EEOC.

Crowley filed a charge of discrimination with the MHRC on December 21, 1998. Crowley Aff. ¶ 137; Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. Y. Defendant argues that this action is subject to the sixty-day filing deferral imposed by the statute, making Plaintiff's effective date of filing February 19, 1999. Defendant L.L. Bean's Motion for Summary Judgment at 5–6. On that basis, Defendant then calculates the three hundred-day period and asserts that only those incidents of alleged sexual harassment occurring on or after April 15, 1998, are actionable under Title VII. *Id.* Plaintiff responds that the work sharing agreement between MHRC and the EEOC waives the sixty-day deferral period so that a case is filed with the EEOC on the same day it is filed with the MHRC—in this case, December 21, 1998.[19] Opposition to Defendant's Motion for Summary Judgment (Docket No. 37) at 14–15.

█ Essentially, the parties disagree on whether the work sharing agreement between the MHRC and the EEOC waives Maine's exclusive sixty-day period for processing a charge of discrimination and, thus, "terminates" the MHRC's proceedings within the meaning of 42 U.S.C. § 2000e–5(c). The work sharing agreement between the MHRC and the EEOC provides that charges filed with the MHRC are "automatically dual filed with the EEOC." Plaintiff's Opposing Statement of Facts, Ryan Aff. and attached work sharing agreement at II(C). The Court interprets that provision of the work sharing agreement to waive Maine's exclusive sixty-day deferral period. Therefore, for purposes of calculating the statute of limitations in this case, Maine "terminated" its proceedings on December 21, 1998, and Plaintiff may be compensated for at least the incidents of discrimination that occurred in the three hundred days preceding December 21, 1998,—in other words, any incident after February 24, 1998.

█ The record establishes at least one act of alleged sexual harassment within the limitations periods for both Title VII and the MHRA. That incident occurred on June 23, 1998, when Juhl was permitted to work in the same building as Crowley and followed her to a remote area of the distribution facility, blocked her way, and made an intimidating statement to her. In light of Juhl's prior conduct, L.L. Bean's knowledge of Juhl's conduct, and L.L. Bean's decision to permit Juhl in the same work area as Plaintiff, the June 23 incident constitutes an actionable incident of sexual harassment within the limitations period. *Cf. United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Having determined that there oc-

---

**19.** Plaintiff asserts that, for purposes of calculating timely filing, the Court should use December 18, 1998, the date she sent her notice of claim to the Maine Human Rights Commission, rather than December 21, 1998, the date her complaint was received by the Commission. Opposition to Defendant's Motion for Summary Judgment. Plaintiff cites no statute or case law that supports her contention. The Court will use December 21, as the date the complaint was "initially instituted" with the MHRC. *See* 42 U.S.C. § 2000e–5(e)(1). In any event, the three-day divergence does not appear to effect the compensability of Plaintiff's claims.

curred at least one incident of sexual harassment within the limitations period for both Title VII and the MHRA, the Court turns to the determination of whether Plaintiff has established a continuing violation.

### 1. Continuing Violation

■ The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations. Continuing violations come in two forms: serial and systemic. L.L. Bean argues that there is not a continuing violation and, thus, the Court cannot consider conduct outside the three hundred-day limitations period prescribed by the statute. *See* 42 U.S.C. § 2000e–5(e)(1). Plaintiff responds that there are issues of fact regarding the existence of both a serial and systemic continuing violation.

### Serial Violation

■ A serial continuing violation occurs where the Title VII violation is of a continuing nature and the charge is filed "during the life of the violation or within the statutory period." *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir.2001)(quoting *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 868 (1st Cir. 1997)). *See also Provencher v. CVS Pharmacy*, 145 F.3d 5, 14 (1st Cir.1998). The Court found above that the June 23, 1998, incident is an allegedly discriminatory event that occurred within the statute of limitations period; hence that incident anchors the earlier claims. In determining whether such an ongoing violation exists, the Court must consider three questions:

1) is the *subject matter* of the discriminatory acts sufficiently similar that there is a substantial relationship between the otherwise untimely acts and the timely acts?

2) are the acts isolated and discrete or do they occur with *frequency* or repetitively or continuously?

3) are the acts of *sufficient permanence* that they should trigger an awareness of the need to assert one's rights?

*O'Rourke*, 235 F.3d at 731 (emphasis in original and citations omitted). In order to establish a serial continuing violation, the Court must answer the first two questions in the affirmative and the final question in the negative. The Court finds that Crowley satisfies the first two prongs of the test. The record establishes, and Defendant does not dispute, that there is a substantial relationship between the June 23, 1998, act and Juhl's previous conduct. The alleged discriminatory conduct occurred on a weekly basis for almost two years. Juhl's conduct ranged from physical contact with Plaintiff, which was clearly intentional and sexual in nature to threatening, as perceived by Crowley, incidents of staring and stalking. The record also contains evidence that the untimely acts of harassment were continuous in time with the timely acts that Crowley has alleged. Plaintiff testified that Juhl's harassment continued unabated, in various forms, from the fall of 1996 through June of 1998. In addition, other L.L. Bean employees testified that they witnessed Juhl's ongoing conduct towards Crowley.

■ Defendant challenges only the third prong of the serial violation test. With respect to the issue of permanence, Defendant argues that Plaintiff knew in early 1997 that she was being subjected to a hostile work environment and that her employer was not responding adequately, but that she nonetheless failed to commence proceedings in a timely manner. Defendant L.L. Bean's Motion for Summary Judgment at 6–7. Plaintiff disputes L.L. Bean's characterization of what she knew in 1997 as knowledge of sexual

harassment and belief that L.L. Bean would not effectively address the situation. Crowley Aff. ¶ 142. The record is clear that, at least by January of 1997, Crowley believed that Juhl was sexually harassing her. There is, however, a genuine issue of material fact as to when Crowley believed that L.L. Bean was not adequately responding to her complaints about Juhl. If Crowley believed prior to February 24, 1998, that L.L. Bean was not doing enough, then she is not entitled to the equitable exception to the statutory filing requirement. On the other hand, if Crowley establishes that she did believe prior to February 24, 1998, that L.L. Bean was adequately responding to her complaints, then she is entitled to recover for a serial continuing violation. *See O'Rourke*, 235 F.3d at 732 (not error for jury to find that serial continuing violation existed where plaintiff, after years of complaints to her employer regarding sexual harassment, filed an EEOC complaint after it became clear to plaintiff that there would be no recourse through her employer).

## Systemic Violation

A continuing violation may also be established with evidence of a pervasive, institutionalized system of discrimination that involves discrimination through an employer's policies or practices. Defendant argues that in order for Plaintiff to successfully assert a claim for systemic continuing violation, the law requires that "a policy actually caused the discrimination" and that L.L. Bean has no policy that caused the discrimination. L.L. Bean's Reply in Support of Its Motion for Summary Judgment (Docket No. 45) at 11. Plaintiff responds that a systemic continuing violation lies in L.L. Bean's practice of the interpretation of what constitutes sexual harassment, as well as its practice of setting an erroneously high threshold for what an employee must say in order for L.L. Bean leadership to recognize and investigate sexual harassment. Specifically, Plaintiff asserts that when enforcing its sexual harassment policy, L.L. Bean reacts only to conduct of an overtly sexual nature as opposed to conduct directed at a victim because of her sex. The alleged discriminatory conduct in this case consists of L.L. Bean's failure to investigate or to take sufficiently aggressive action against Juhl after receiving complaints regarding his conduct towards Crowley.

Defendant relies on an overly narrow construction of what type of conduct on an employer's part will constitute a systemic continuing violation—one which ignores the fact that the law allows for a refusal to rectify a discriminatory practice or a repetition of the practice itself to constitute a continuing violation of civil rights. The record demonstrates that issues of fact exist as to whether L.L. Bean permitted Juhl's allegedly harassing conduct to continue unremedied for so long as to amount to a discriminatory policy or practice on the part of L.L. Bean. Specifically, L.L. Bean's knowledge of the harassment from January 1996 and its failure to take any meaningful steps to address the situation until June 1998 constitute evidence of such a policy or practice. Hence, whether L.L. Bean failed to rectify its practice of not acknowledging harassment based on sex and, if so, whether such failure to rectify a discriminatory practice or a repetition of the practice itself renders the act a continuing violation of Plaintiff's rights remain issues to be resolved by the trier of fact. That is, the trier of fact must determine whether L.L. Bean either engaged in a company policy of discrimination or refused to rectify a continuing practice that discriminated on the basis of gender. Accordingly, there are issues of

fact to be resolved at trial regarding both types of a continuing violation.[20]

## B. Prima Facie Case of Hostile Work Environment

The Court now turns to the conduct at issue, and whether, if proven, it is actionable under Title VII. L.L. Bean asserts that Crowley cannot prove a prima facie case for hostile work environment sexual harassment. Plaintiff disagrees. In general terms, hostile work environment sexual harassment is unwelcome gender-motivated harassment that constructively alters the terms, conditions, or privileges of employment without causing tangible job detriment. To establish a prima facie case for hostile work environment sexual harassment, Crowley must show the following: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and to create an abusive work environment; (5) that the sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive, and that the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. *See O'Rourke*, 235 F.3d at 728 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–89, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Har-*

*ris v. Forklift Sys., Inc.*, 510 U.S. 17, 20–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

Here, it is undisputed that Crowley is a member of a protected class and that she was subjected to harassment. Thus, the first and second elements of her prima facie claim are met. All of the other elements of Crowley's claim are in dispute. The Court will address the remaining elements of Plaintiff's prima facie case in turn.

### 1. Unwelcome Harassment Based On Sex

L.L. Bean admits that Crowley was harassed by Juhl, but insists that such harassment was not sexual or based on her sex. Specifically, L.L. Bean asserts that "Juhl's efforts to befriend and get near Plaintiff were not objectively based on her sex, and thus are not actionable, irrespective of Plaintiff's subjective interpretation of his conduct." Defendant L.L. Bean's Motion for Summary Judgment at 10. Plaintiff responds that the sexual harassment in this case was directed at her because she was a woman, and maintains that if she were a man, Juhl would not have treated her in the same manner. Opposition to Defendant's Motion for Summary Judgment at 4.

On this record, there is an issue of fact as to whether Crowley suffered harassment based on sex. While a jury could

---

**20.** Even if Plaintiff fails to establish a continuing violation, a discriminatory act which is not made the basis for a timely charge may still be relevant background evidence in a Title VII proceeding. *See United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). The post-February 24, 1998, acts take on a different flavor when considered in the context of a two-year pattern of behavior that included unauthorized entry into her home and car, unwelcome grabbing of her foot and hand, and stalking her at work and outside the workplace. Therefore, contrary to Defendant's assertion, the incidents that occurred before February 24, 1998, even if time-barred, would clearly be relevant to demonstrate important context for the later allegedly discriminatory behavior of Juhl.

find that the hostile conduct directed toward Crowley was Juhl's way of attempting to make friends or find other non-sexual motivations for his conduct, this does not eliminate the conclusion by a jury that his treatment of Crowley was based on her sex. *See e.g., Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity ..."). The Court is mindful that in a case such as this, where the issue turns to a significant degree on how words and actions were communicated, a plain record may not adequately capture what happened on any given occasion. Words, in sexual harassment cases in particular, can take on very different meanings depending on how those words were communicated and the context in which they were communicated. For example, an otherwise non-explicit word, depending on the tone of the speaker, may come across as humorous, tongue-in-cheek, or as a sexual advance. There is sufficient evidence in the record on the issue of whether Juhl's conduct was based on Crowley's sex to withstand summary judgment.

### 2. Harassment Alters the Conditions of Employment

The fourth element of the prima facie case requires that Crowley show that the harassing conduct was sufficiently severe or pervasive so as to alter the conditions of her employment. Defendant first challenges the severity of the harassment, asserting that "[t]he severity of Juhl's alleged harassment of Plaintiff falls far below ... actionable sexual discrimination." Defendant L.L. Bean's Motion for Summary Judgment at 10. Defendant also argues that Crowley "has

offered no showing that the alleged harassment hindered her productivity, diminished her prospects for pay raises or promotions, or negatively affected her evaluations by superiors." L.L. Bean's Reply in Support of Its Motion for Summary Judgment at 5.

Addressing this point, the Supreme Court has instructed that a court should look to all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is a mere offensive utterance or physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367, 126 L.Ed.2d 295. The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See, e.g., Faragher,* 524 U.S. at 787 n. 1, 118 S.Ct. at 2283 n. 1; *Oncale,* 523 U.S. at 82, 118 S.Ct. at 1003.

The record in this case is sufficient to allow the jury to consider this issue. Crowley has established that she was repeatedly exposed to Juhl's intimidating conduct in the workplace. In addition, the record demonstrates that there are issues of fact to be resolved as to whether the intimidating workplace was severe enough to prevent Crowley from effectively performing her duties. *See Burlington Indus. v. Ellerth,* 524 U.S. 742, 751–52, 118 S.Ct. 2257, 141 L.Ed.2d 633, (1998) (noting that distinction between quid pro quo and hostile work environment harassment is concrete versus constructive alteration of terms, conditions, or privileges of employment). The record includes evidence that Juhl's conduct directly interfered with Crowley's work performance, as evidenced by Crowley leaving work after interactions with him, Crowley's hospitalization for

stress-related illness, and her having to move to different places during her shift in an attempt to avoid Juhl. Additionally, the record demonstrates that Juhl frequently put his machine in the way of Crowley's machine, and that this conduct affected Crowley's work by stopping her from moving in and out of aisles quickly and affecting safe maneuvering of the large warehouse vehicles. Crowley Aff. ¶¶ 59–60. Resolving all ambiguities and drawing reasonable inferences in favor of Crowley, the Court concludes that a jury could find that Juhl's actions constituted conduct that a reasonable person in Crowley's position would find sufficiently severe or pervasive to alter the conditions of her employment.

### 3. Harassment Subjectively and Objectively Offensive

In addition to being severe or pervasive, actionable hostile work environment sexual harassment must be both subjectively and objectively offensive—conduct or language that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *See Faragher,* 524 U.S. at 787, 118 S.Ct. at 2283; *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295. Turning to the subjective portion of the analysis, the Court finds that the record reveals that Crowley found the environment to be hostile and abusive. Construing the facts in Crowley's favor, she was allegedly subjected to a variety of hostile incidents by Juhl, including: his following her to her car, the bathroom, and remote areas of the warehouse; his blocking her movement in the warehouse facilities; his grabbing her foot; and his entering her house without permission. Crowley has testified that she felt threatened and was frightened by these incidents. Crowley Aff. ¶ 11, 16–17, 21, 29–30. Crowley's statements to coworkers and management, as well as L.L. Bean's investigative notes corroborated her distress. McCourt Aff. ¶ 9;

Anderson Depo. at 21–23; Defendant L.L. Bean's Statement of Undisputed Material Facts, Ex. P Bressette–Long notes. Indeed, Crowley's complaints about her environment were serious enough to prompt L.L. Bean to attempt, for a time, to separate Crowley and Juhl. There is no evidence to refute Crowley's testimony concerning her subjective feelings. Thus, Crowley has satisfied the subjective component of establishing a hostile environment claim. This evidence is sufficient to support the conclusion that Crowley actually perceived her environment to be abusive.

Turning next to the objective component of the analysis, the Court finds that there are material issues of fact regarding whether the infliction of harassment was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. Whether a reasonable person would objectively perceive Juhl's conduct as creating a hostile work environment is a matter frequently left to the sound discretion of reasonable jurors, and should be left to the jurors in this case. As discussed above, the evidence reflects that Crowley worked in a large warehouse facility, where she faced a number of intimidating behaviors by Juhl, including his following and watching her and blocking her movement. The repeated incidents at the L.L. Bean facility were all in addition to a number of other disturbing events that occurred off L.L. Bean property, including Juhl entering her home without permission attempting to force Crowley to touch him, and possible surveillance of her at home. This evidence may lead a jury to conclude that Juhl's harassment was pervasive enough such that a reasonable person would find the environment hostile or abusive. Evaluating the severity and pervasiveness of a harasser's conduct on summary judgment is often difficult and, in many cases, inap-

propriate. This is especially so in the instant case, as Crowley's allegations of a hostile work environment are unusual; they are not the typically alleged sexually derogatory comments or a physically abusive work environment. Resolving ambiguities and drawing all reasonable inferences in Crowley's favor, the Court cannot say, as a matter of law, that these incidents could not amount to a claim of a hostile work environment. A reasonable jury could find that the totality of the incidents of which Crowley complains were sufficiently severe and pervasive to constitute a hostile work environment.

#### 4. Basis for Employer Liability

In a case where an employee is harassed by a coworker, a plaintiff must also show a basis for employer liability. To impute Juhl's harassing conduct to L.L. Bean, Plaintiff must demonstrate that L.L. Bean "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *White v. New Hampshire Dep't of Corrections*, 221 F.3d 254, 261 (1st Cir.2000)(quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir.1997) (internal quotation marks omitted)). L.L. Bean argues that it took appropriate employment actions to remedy the situation. Plaintiff disagrees.

The record establishes that L.L. Bean knew of the harassment by Juhl. L.L. Bean was put on notice of the harassment Crowley experienced by repeated, specific complaints from Crowley to several managers. Crowley complained of harassment to Bressette–Long, Andretta, Marong, McCourt, Baker, Farley, Gowen, Davis, and Anderson. In this case, the complaints Crowley lodged gave L.L. Bean sufficient notice to impute liability to the company. Nevertheless, a clear factual issue exists as to whether L.L. Bean, on notice of Plaintiff's allegations of a hostile work environ-

ment from early 1997, took "prompt and appropriate corrective action" adequate to remedy the situation. Accordingly, the Court finds that there are genuine issues of material fact as to whether Crowley was subjected to hostile work environment sexual harassment by L.L. Bean.

#### C. Punitive Damages

■ Crowley seeks punitive damages under Title VII for the hostile environment that she was subjected to while working at L.L. Bean. Punitive damages may be awarded under Title VII only when a "complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). L.L. Bean seeks summary judgment on the punitive damages issue, arguing that its accommodation of Crowley's concerns and complaints bears no resemblance to the malice or recklessness required to make out a claim for punitive damages. Defendant L.L. Bean's Motion for Summary Judgment at 16. Crowley responds that her claim survives summary judgment, pointing to the evidence in the record that shows that L.L. Bean allowed Juhl to work in Crowley's building even after issuing him a written warning to stay away from Crowley. Opposition to Defendant's Motion for Summary Judgment at 18.

In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), Supreme Court expressly rejected the idea "that eligibility for punitive damages can only be described in terms of an employer's 'egregious' misconduct." *Id.* at 534–35, 119 S.Ct. at 2124. The terms "malice" and "reckless indifference" ultimately focus on the actor's state of mind. *See id.* at 534–35, 119 S.Ct. at 2123–24. Thus, the proper question is

whether the employer engaged in the conduct alleged with the "knowledge that it may be acting in violation of federal law." *Id.* at 535, 119 S.Ct. at 2124. "[A]n employer must at least discriminate in the face of a perceived risk that its action will violate federal law to be liable in punitive damages." *Id.* at 536, 119 S.Ct. at 2125.

The record contains sufficient evidence to create an issue of material fact over whether L.L. Bean discriminated against her with reckless indifference to her rights. In this case, Crowley alleges that, in terms of any definitive action to stop Juhl's conduct, L.L. Bean substantially ignored her complaints about Juhl's harassment and intimidation for nearly two years. Although L.L. Bean put forth some effort to keep Juhl away from Crowley, the record establishes that there were many instances after L.L. Bean was on notice of Juhl's intimidating behavior in which L.L. Bean permitted Juhl to work with Crowley. Indeed, the written warning that L.L. Bean issued to Juhl stated that he had created a "hostile environment" and had "engaged in threatening and intimidating behavior." Defendant L.L. Bean's Undisputed Statement of Material Facts, Ex J. There remains an issue of fact as to whether the conduct by L.L. Bean, in allowing Juhl to work in the same building as Crowley, was taken with knowledge that it may be acting in violation of federal law. The Court will deny Defendant's motion with respect to Crowley's claims for punitive damages.

### D. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment be, and it is hereby, **DENIED** on Count I and Count II.